47 A.3d 690

PAUL M. DEPASCALE, PLAINTIFF-RESPONDENT, v. STATE
OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued March 26, 2012—Decided July 24, 2012.

Robert T. Lougy, Assistant Attorney General, argued the cause for appellant (Jeffrey S. Chiesa, Attorney General of New Jersey, attorney; Mr. Lougy and Jean P. Reilly, on the briefs).

Justin P. Walder argued the cause for respondent (Walder, Hayden & Brogan, attorneys; Mr. Walder, Barry H. Evenchick, and Leigh-Anne Mulrey, of counsel and on the briefs).

Susan A. Feeney, President, argued the cause for amicus curiae New Jersey State Bar Association.

Justices LaVECCHIA and ALBIN, and Judge WEFING (temporarily assigned) delivered the opinion of the Court.

On June 28, 2011, the Pension and Health Care Benefits Act (Chapter 78) was enacted into law, L. 2011, c. 78—a law that applies to all public employees, including Supreme Court justices and Superior Court judges then in service. Article VI, Section 6, Paragraph 6 of the New Jersey Constitution provides that justices and judges "shall receive for their services such salaries as may be provided by law, which shall not be diminished during the term of their appointment" (the No-Diminution Clause). Under Chapter 78, over a course of seven years, sitting justices and judges will be subject to a more than four-hundred percent increase in their pension contributions and a more than one-hundred percent increase in their health care contributions.[1] Because the increased individual contributions are imposed without any corresponding

---

[1] These calculations and others discussed throughout are based on Chapter 78's impact on the salaries of Superior Court, Law and Chancery Division judges. Moreover, the health care calculation is based on family coverage for the participant.

salary increase, the take-home salaries of justices and judges will decrease in the range of seventeen-thousand dollars or more, representing a more than ten percent decline in their disposable income.

The issue before us is not whether justices and judges should contribute to their pension and health care insurance plans. They do. The issue is not whether the new law applies to justices and judges appointed after the date of the legislation's enactment. It does. The issue is not whether any future judicial pay raise can be dedicated to increased pension and health care contributions by justices and judges. It may. Rather, the issue is whether Chapter 78 violates the New Jersey Constitution by diminishing the salaries of justices and judges during the terms of their appointments. We conclude that it does. No court of last resort—including the United States Supreme Court—has upheld the constitutionality of legislation of this kind.

Chapter 78 increases the amount that all public employees must contribute to their pension and health care insurance plans. That law does not discriminate between justices and judges and other public employees, but the State Constitution does. The Framers of the Constitution prohibited the Legislature from diminishing the salaries of sitting justices and judges—not other public employees. The Framers did so to protect the independence of the judiciary and to ensure that it remained a separate and equal—not subordinate—branch of government.

The Framers recognized the unique role that the judiciary plays in our tripartite form of government. Because one of the core functions of the judiciary is to serve as the guardian of the fundamental rights of the people—rights enshrined in the Constitution—the judiciary, at times, must restrain legislative initiatives or executive actions that may threaten those rights and violate the Constitution. By barring the Legislature and Executive from diminishing the salaries of sitting justices and judges, the Framers intended to prevent those branches from placing a chokehold on the livelihood of jurists who might be required to oppose their

actions. The constitutional restraint on diminishing judicial salaries is not for the benefit of judges, but for the benefit of the public. The public is the ultimate beneficiary of a fearless and independent judiciary, for a timid and subservient judiciary will be an uncertain guarantor of fundamental rights. The public must have confidence in the integrity of the judiciary. Article VI's No–Diminution Clause promotes that goal in perception and reality.

The State concedes that a direct seventeen-thousand-dollar *reduction* in salary during the term of appointment of a justice or judge would violate this constitutional clause. However, the State characterizes Chapter 78 as a seventeen-thousand-dollar *deduction* from salary—not a diminution in salary. Through this magical reformulation, although the take-home salaries of justices and judges will be approximately seventeen-thousand dollars less, an unconstitutional diminution becomes a constitutional deduction. However artfully the State describes the effect of Chapter 78—as either a direct or indirect diminution in salary—it remains, regardless of the wordplay, an unconstitutional diminution.

Whatever good motives the Legislature might have, the Framers' message is simple and clear. Diminishing judicial salaries during a jurist's term of appointment is forbidden by the Constitution. Accordingly, beyond any doubt, *see In re P.L. 2001, Chapter 362*, 186 *N.J.* 368, 392, 895 *A.*2d 1128 (2006), Chapter 78 violates Article VI, Section 6, Paragraph 6 of the New Jersey Constitution.

## I.

### A.

No party has objected to this Court deciding the constitutional issue before us, even though the resolution of that issue involves a pecuniary interest touching members of this Court and most of the judiciary. *See Code of Judicial Conduct,* Canon 3(C)(1)(c). We raise the issue ourselves to eliminate any doubt that it was considered carefully by the Court. It is understood that we must decide this issue because the rule of necessity demands that we do

so. We are charged with the solemn responsibility of construing the meaning of the New Jersey Constitution. It is a responsibility we cannot evade. *See In re P.L. 2001, supra,* 186 *N.J.* at 393, 895 *A.*2d 1128 ("The rule of necessity forbids the disqualification of the entire judiciary from hearing a case even if there is some perception that the result may be tinged by self-interest."). We must review this question of constitutional import fairly and impartially. Other courts have done the same. *See, e.g., United States v. Will,* 449 *U.S.* 200, 211–16, 101 *S.Ct.* 471, 479–81, 66 *L.Ed.*2d 392, 404–06 (1980); *Stilp v. Pennsylvania,* 588 *Pa.* 539, 905 *A.*2d 918, 929 (2006). We do nothing different here.

### B.

The law challenged in this action, Chapter 78, implements contributory changes to public employee pensions and to the State Health Benefits Plan (SHBP) for public employees. It increases judicial pension contributions for sitting justices and judges from the current three percent of salary applicable for Judicial Retirement System (JRS) members to a mandatory twelve percent of salary, *L.* 2011, *c.* 78, § 9, and it increases judicial contributions for health benefits from the current one-and-one-half percent of salary to a required thirty-five percent of premium,[2] *L.* 2011, *c.* 78, § 39. Chapter 78's increase in required judicial pension deductions—from three percent to twelve percent of salary—is phased in incrementally over the next seven years. *L.* 2011, *c.* 78, § 9. As a result of Chapter 78, over a course of seven years justices and judges appointed prior to the new law's effective date will be subject to a more than four-hundred percent increase in required pension contributions and a more than one-hundred percent in-

---

[2] According to the statement accompanying the bill, by changing public employees' contribution rates for health care benefits, Chapter 78 aims to require more-highly compensated employees to pay a higher percentage of the costs of health care coverage while imposing a lesser cost on lower-compensated employees. *Statement to S., No. 2937,* 214th Leg. (N.J.2011). The bill ensures that all employees contribute at least one-and-one-half percent of compensation toward the cost of health coverage. *Ibid.*

crease in required health plan contributions. In effect, the take-home salaries of justices and judges will decrease in the range of seventeen-thousand dollars or more, representing a more than ten percent decline in their disposable income.

Significantly, there was a precursor to Chapter 78, Assembly Bill 3796. That Assembly Bill was introduced on February 23, 2011, to address problems cited by a Special Session Joint Legislative Committee on Public Employees Benefits Reform, which had issued a report in December 2006 calling for public employee pension and health benefit reforms. *See* Special Session Joint Legislative Comm. on Pub. Emp. Benefits Reform, Final Report (2006), *available at* http://www.njleg.state.nj.us/PropertyTax Session/JCPE_final_report.pdf. That bill called for increases in contributions by members of the various public employee pension funds, but it specified that the newly increased contribution rate would apply only to new members of the Judicial Retirement System, to which justices and judges must belong, and to future salary increases of current JRS members. Assemb. 3796, § 34, 214th Leg. (N.J.2011). The bill's statement provided that "[t]he increase in the contribution rate for members of the JRS [be] implemented in a manner to conform to a prohibition in the State Constitution against the reduction in the compensation of a judge during the judge's term of appointment." Assemb. 3796 (Sponsor's Statement), 214th Leg. (N.J.2011). Ultimately, Assembly Bill 3796 was not enacted.

The bill that at signing became Chapter 78 had been introduced on June 13, 2011, *see* Office of Legislative Services, *New Jersey Legislative Digest, 214th Leg., 2nd Sess.*, at 2 (June 16, 2011) (indicating passage of public pension and benefits bill), moved through the Legislature, *see* Office of Legislative Services, *New Jersey Legislative Digest, 214th Leg., 2nd Sess.*, at 3 (June 20, 2011), and was signed into law by the Governor fifteen days later on June 28, 2011, *see* Office of Legislative Services, *New Jersey Legislative Digest, 214th Leg., 2nd Sess.*, at 10 (June 27, 2011).

C.

On July 21, 2011, plaintiff Paul DePascale filed a one-count verified complaint and order to show cause in the Law Division, seeking a judgment declaring that Chapter 78 violates Article VI, Section 6, Paragraph 6 of the New Jersey Constitution because it diminishes the salary of justices and judges during their terms of service. The Honorable Linda Feinberg, A.J.S.C., signed an order to show cause, heard argument, and considered the parties' briefs on the order to show cause and on the State's motion to dismiss the complaint for failure to state a claim on which relief can be granted.

On October 17, 2011, the court issued its decision holding Chapter 78 unconstitutional as applied to sitting justices and judges. The court concluded that requiring justices and judges in service to make increased judicial contributions to the pension system, as set forth in Chapter 78, amounts to an unconstitutional diminution in judicial salaries. The court reached the same conclusion with respect to health benefits.

The State filed a notice of appeal with the Appellate Division and applied to the trial court for a stay pending appeal. The trial court denied the stay request. On November 18, 2011, the Appellate Division similarly denied the State a stay. Plaintiff then filed with this Court a motion for direct certification pursuant to *Rule* 2:12-2(a), which we granted on November 10, 2011. *DePascale v. State*, 209 *N.J.* 431, 38 *A.*3d 559 (2011).

II.

Article VI, Section 6, Paragraph 6 of the 1947 New Jersey Constitution provides that justices and judges "shall receive for their services such salaries as may be provided by law, which shall not be diminished during the term of their appointment." The derivation of that provision in our current Constitution can be clearly traced to its origins in the United States Constitution.

Article III, Section 1 of the Federal Constitution (the Federal No–Diminution Clause or Federal Clause) provides:

> The judicial power of the United States shall be vested in one Supreme Court, and in such Inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the Supreme and Inferior Courts, shall hold their offices during good behavior; and shall, at stated times, receive for their services a compensation, which shall not be diminished during their continuance in office.

New Jersey has had, to date, three Constitutions. The first, the Constitution of 1776, preceded the adoption of the Federal Constitution. Although the 1776 Constitution included an article addressing, "Judges, attorney-general, secretary, treasurer and clerks," it did not identify how judges were to be paid. *N.J. Const. of 1776* art. XII. The 1844 State Constitution, the first New Jersey Constitution to be ratified in the wake of the Federal Constitution's adoption, for the first time addressed judicial compensation and included a clause mirroring Article III, Section 1 of the United States Constitution to ensure that certain judicial officers, like their federal counterparts, shall not have their compensation diminished during the terms of their office. *See N.J. Const. of 1844* art. VII, § 2, ¶ 1 (stating that "[t]he justices of the supreme court and chancellor . . . shall, at stated times, receive for their services a compensation which shall not be diminished during the term of their appointments"). The clause preventing diminution in "compensation" in the 1844 Constitution protected those judicial officials without specifying the level of compensation.[3]

The drafters of the 1844 Constitution included the No–Diminution Clause to protect judges from retaliation by the political branches. That is evident because the language of that clause exactly tracked the wording of the No–Diminution Clause in the

---

[3] In comparison, Article V, Paragraph 5 provided "a compensation" to be paid to the Governor and stipulated that same "shall be neither increased nor diminished during the period for which he shall have been elected." The Legislature, which more than any other branch controlled the purse strings, was singled out for more specialized restriction. It was subjected to constitutionally prescribed compensation. *See N.J. Const. of 1844* art. IV, § 4, ¶ 7 (prescribing fixed legislative compensation in 1844 and as amended in 1875).

Federal Constitution. The purpose and import of the federal provision was well-understood by the people of that era. In the Declaration of Independence, one of the grievances specifically laid out against King George III was that "[h]e has made Judges dependent on his Will alone for the tenure of their offices, and the amount and payment of their salaries." *The Declaration of Independence* para. 11 (U.S.1776). With the history of the Revolution fresh in their minds, the United States Constitution's Framers were anxious to preserve the independence of the judiciary by ensuring that a judge's livelihood would not be totally dependent on the other branches of government. *See O'Donoghue v. United States*, 289 *U.S.* 516, 531, 53 *S.Ct.* 740, 743, 77 *L.Ed.* 1356, 1361 (1933) (stating "requirement was foreshadowed, and its vital character attested, by the Declaration of Independence").

In advocating for ratification of the proposed Federal Constitution in Federalist Paper Number 78, Alexander Hamilton wrote about the importance of preserving an independent judiciary. *The Federalist* No. 78, at 392–99 (Alexander Hamilton) (Gary Wills ed., 1982) (*The Federalist* ). He also understood that a key element of judicial independence is a protected salary. "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. . . . In the general course of human nature, a power over a man's subsistence amounts to a power over his will." *The Federalist, supra,* No. 79, at 400 (Alexander Hamilton).

It is beyond dispute that the essential role of the Federal Constitution's No–Diminution Clause is to ensure judicial independence and a meaningful separation of powers. *See United States v. Hatter,* 532 *U.S.* 557, 567–69, 121 *S.Ct.* 1782, 1790–91, 149 *L.Ed.*2d 820, 831–33 (2001) (reaffirming Court's prior explanation of Clause's importance). The Clause's proscription applies regardless of the motives of the Legislature or Executive, thus avoiding suspicion between the branches. *See id.* at 577, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 838. The Clause places judges' remuneration, once established, beyond the power of the other two branches

to diminish. This guarantees that the judicial power will not be exercised for the purpose of seeking favor or avoiding retribution from the other branches. During the ratification process that occurred throughout the states, that purpose was made manifest. *See The Federalist, supra,* No. 79, at 400 (Alexander Hamilton). Also, in a debate conducted not long afterward at the Virginia State Convention that considered the passage of a new state constitution, Chief Justice John Marshall emphasized the vital importance of maintaining an independent judiciary, free of any corrupting influences, such as the power over the livelihood of a judge. To that end, he stated: " 'Is it not to the last degree important that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience?' " *Evans v. Gore,* 253 *U.S.* 245, 250, 40 *S.Ct.* 550, 552, 64 *L.Ed.* 887, 891 (1920) (quoting *Debates, Virginia Convention, 1829–1831,* 616, 619).

In recognition that the Clause's primary purpose is "not to benefit the judges, but . . . to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations, and pervading principles of the Constitution," the Supreme Court has directed that the provision be "construed, not as a private grant, but as a limitation imposed in the public interest." *Evans, supra,* 253 *U.S.* at 253, 40 *S.Ct.* at 553, 64 *L.Ed.* at 892. That guiding principle to the provision persists to this day in federal law. *See Hatter, supra,* 532 *U.S.* at 567–69, 121 *S.Ct.* at 1790–91, 149 *L.Ed.*2d at 831–33 (reaffirming *Evans'* explanation of Clause's importance). It is also the jurisprudential underpinning of the No–Diminution Clause of the 1947 New Jersey Constitution.

In crafting a new structure for the judiciary, the drafters of the 1947 State Constitution carried over the No–Diminution Clause from the 1844 Constitution. The clear purpose of the Clause is to protect judges from attempts by the two other branches of government to influence judicial decision-making through economic means. The detailed records of the proceedings of the drafting of the 1947 Constitution are replete with references about judicial

independence and the need to attract qualified lawyers to serve as judges. Governor Alfred E. Driscoll personally addressed the Committee on the Judiciary (Committee), and underscored the point, eloquently arguing for an independent judiciary that would not fear checking the other branches of government if they overstepped their constitutional bounds.

> It is, as you know, the courts that have traditionally been the guardians of our constitutions.... Without independent courts, the whole republican system must surely fail. Our primary, our basic purpose in the drafting of a new Constitution is to secure beyond any question a strong, competent, easily functioning, but always independent, judiciary, and, therefore, in a position to curb any tendency on the part of the other two branches of government to exceed their constitutional authority.
>
> [4 *Proceedings of the Constitutional Convention of 1947*, at 428–29.]

Evelyn M. Seufert, who played a pivotal role in the Convention's proceedings, submitted a draft judicial article for the Committee's consideration.[4] In explaining the draft to the Committee, she commented that "[t]he independence, responsibility and efficiency of the judicial branch depend on several constitutional factors, including the organization, administration, and powers of the courts; and the provisions concerning the selection, terms, retirement, removal, and compensation of the judges." 4 *Proceedings of the Constitutional Convention of 1947*, at 578. She also understood that an independent judiciary was necessary for a proper balance of power in the State Government as a whole. *Id.* at 581–82; *see also id.* at 36 (testifying that important principle in new Constitution would be "system [that] sets up independence for the

---

[4] Seufert was a member of the New Jersey Bar and was one of thirty individuals selected to serve on Governor Driscoll's Committee on Preparatory Research, 1 *Proceedings of the Constitutional Convention of 1947*, at 921, a body tasked with "develop[ing] material that might be of help to the delegates" to the Constitutional Convention, 2 *Proceedings of the Constitutional Convention of 1947*, at 1328. The members of the Committee prepared monographs on topics that might be of assistance to the delegates, helped draft Rules for the Convention, and put together a library of reference materials that were available to the delegates. *Ibid.* Seufert herself wrote two monographs, entitled "Problems of Judicial Selection and Tenure," 2 *Proceedings of the Constitutional Convention of 1947*, at 1631, and "The Judicial Council," 2 *Proceedings of the Constitutional Convention of 1947*, at 1659.

judiciary"). She was not alone in expressing the need for an independent judiciary. In a separate statement, a Convention delegate and Judiciary Committee member, Wayne McMurray, also emphasized, "The public also wants independent judges, and it is willing to render them free of financial pressures and is willing to see them adequately paid and adequately pensioned." 1 *Proceedings of the Constitutional Convention of 1947*, at 501.

█ Although the term "salary" replaced "compensation" in the Clause as it reappeared in the Judicial Article of the 1947 Constitution, that was done without any intention to alter the protections afforded to the members of the judiciary under the 1844 Constitution. Nothing in the minutes of the 1947 Constitutional Convention supports the conclusion that a meaningful difference was intended by replacing "compensation" with "salary." *See, e.g.,* 2 *Proceedings of the Constitutional Convention of 1947*, at 1180–97 (setting forth Committee on Judiciary's annotations to proposed judicial article, with no reference made to use of term "salaries"). We find no evidence to suggest that the new term was introduced in 1947 as a "policy changer." There are no comments on the subject in the extensive record about the deliberations on the draft Judicial Article. The drafters of the 1947 State Constitution surely did not harbor a secret, unarticulated desire to afford state judges a lesser protection than the one afforded to judges in the United States Constitution or the State's 1844 Constitution. Reduction of a sitting judge's pay, whether that pay is denominated as compensation or as salary, was anathema to the drafters of both the 1844 and 1947 Constitutions. And, the State, in fact, concedes that the protection under our constitutional No–Diminution Clause was intended to provide no less protection than that provided to federal judges.

Moreover, the terms "salary" and "compensation" were used interchangeably by participants during the 1947 Convention in discussions concerning remuneration for judges. The terms also are used interchangeably in the text of the Constitution itself, without any indication that the choice to use different terms in

different provisions was meaningful. *Compare N.J. Const.* art. VI, § 6, ¶ 6 (providing that justices and judges must receive "salaries"), *with N.J. Const.* art. VI, § 7, ¶ 3 (providing that Clerk of Supreme Court and Clerk of Superior Court be paid "compensation"), *and N.J. Const.* art. IV, § 4, ¶ 7 (providing that legislators be provided "compensation").

Even at the time of the founding of our republic, the terms salary and compensation were used interchangeably. The Declaration of Independence protested that judges' "salaries" were "dependent on [the King's] will alone," para. 11 (U.S.1776), and the United States Constitution ensured that judges' "compensation" "shall not be diminished during their continuance in office," *U.S. Const.* art. III, § 1. There is nothing to suggest that the drafters of these two documents intended any distinction between the terms "salary" and "compensation."

In sum, nowhere in the annals of the Constitutional Convention is there any evidence that the 1947 No–Diminution Clause was intended to serve a purpose different from the one contained in the Federal Constitution or in our 1844 Constitution. "The polestar of constitutional construction is always the intent and purpose of the particular provision." *State v. Apportionment Comm'n,* 125 *N.J.* 375, 382, 593 *A.2d* 710 (1991). The Framers' intention and purpose can be readily gleaned from the 1947 Constitutional Convention Proceedings Record, which was created to preserve a complete and accurate account of the Constitutional Convention. *See* 1 *Proceedings of the Constitutional Convention of 1947,* at v; *see also Lloyd v. Vermeulen,* 22 *N.J.* 200, 206–10, 125 *A.2d* 393 (1956) (looking to Constitutional Convention proceedings to determine meaning of constitutional provision).

■ The No–Diminution Clause of the Federal Constitution, of the 1844 Constitution, and of today's State Constitution all serve the same purpose—to maintain the separation of powers and promote true judicial independence. The power to reduce a judge's salary will leave the public uncertain whether judicial decisions are animated from a desire to seek favor or from fear of

retribution. The Clause ensures judicial integrity both in perception and in action. It ensures that the judicial branch will not become subservient to the other branches and will be capable of carrying out its mission in our constitutional democracy. The self-evident meaning of the Clause has been recognized by the political branches since 1947 and is demonstrated by the contemporaneous and consistent adherence of the Legislature to the Clause.

## III.

Until enactment of Chapter 78, no Legislature has allowed a diminution in sitting judges' remuneration when imposing a pension contribution on judges. Every time the Legislature has imposed on judges a contribution requirement for pensions, it enacted a corresponding judicial salary increase. The Legislature carefully assured that no diminution in salary occurred. In each instance, the Legislature honored the No–Diminution Clause.

## A.

By way of background, the adoption of the 1947 Constitution, Article VI, Section 6, Paragraph 3 required that Supreme Court justices and Superior Court judges "shall be retired upon attaining the age of 70 years," and that provision for pensioning of such justices and judges "shall be made by law." *See also N.J. Const.* art. VI, § 6, ¶ 5 (providing that Governor, pursuant to procedure constitutionally dictated, might retire justice or judge substantially incapacitated from performing judicial duties, "on pension as may be provided by law"). The Legislature carried out that mandate when the 1947 Constitution was ratified by enacting *L.* 1948, *c.* 391 (eventually codified at *N.J.S.A.* 43:6–6.4 to –6.10), which provided a pension for Supreme Court justices and Superior Court judges paid for through contributions made by the State Treasurer from state funds.[5]

---

[5] Prior to enactment of *L.* 1948, *c.* 391, judges of various state courts received pensions when and in accordance with legislation that was directed at judges of

In 1973, the Legislature enacted Chapter 130, creating the Judicial Retirement System, a non-contributory unified judicial pension system designed to replace the various judicial pension programs previously codified at *N.J.S.A.* 43:6–6.4 to –6.10 and *N.J.S.A.* 2A:3–21.2 to –21.13. The JRS, codified at *N.J.S.A.* 43:6A–1 to –47, established procedures that have governed the retirement and pensioning of justices and judges since its repeal of earlier statutes. Membership in the JRS is mandatory for justices of the Supreme Court and judges of the Superior Court. *N.J.S.A.* 43:6A–5.

As the legislative history to the JRS Act plainly discloses, the bill was intended to create a uniform pension system that "would eliminate any requirement of a contribution by judges to the pension system." *Statement to S., No. 536*, 195th Leg. (N.J.1972). It brought the pension systems for judges of the various courts in New Jersey into conformity in that respect. Prior to the JRS Act, Supreme Court justices, Superior Court judges, and some county court judges, generally,[6] were part of a non-contributory pension

---

specific courts, the earliest of which was enacted in 1908. *See L.* 1908, *c.* 313. That 1908 Act was subjected thereafter to a series of amendments altering the age of retirement, *see L.* 1911, *c.* 185 (lowering retirement age from 73 to age 70), breadth of application, *see L.* 1919, *c.* 104, and amending the years and type of judicial service required as well as the calculation of benefit provided upon retirement, *see L.* 1920, *c.* 107; *L.* 1927, *c.* 43. *See also L.* 1937, *c.* 179 (amending *L.* 1908, *c.* 313 by adding provision for pensioning of judges of court of common pleas, but requiring payment by county treasurer for their pensions). *See generally Cnty. of Bergen v. McConnell,* 58 *N.J.Super.* 495, 501–03, 156 *A.2d* 705 (App.Div.1959) (addressing funding of pensions for county court judges pre- and post-adoption of 1947 Constitution). Over time exceptions began to be folded into a State-supported pension system. *See, e.g., N.J.S.A.* 2A:3–21.2 to –21.13 (repealed by *L.* 1973, *c.* 130, § 45) (requiring State Treasury to pay pensions to County Court judges as of 1963).

Importantly, with adoption of the 1947 Constitution, previous statutes addressing the payment and pensioning of judges of different courts were adjusted to account for the adoption of a new judicial system that did not provide for the continued service of all judges of the former court system. *See, e.g., L.* 1948, *cc.* 392, 393.

[6] Notably, some judges who carried over service from judicial positions in existence prior to the adoption of the 1947 Constitution, and who received a

program, while other county court judges and judges of the county district court and juvenile and domestic relations court were members of the Public Employees Retirement System, which required individual contribution by the judges. *See generally Signing Statement, L.* 1973, *c.* 140 (eff. May 22, 1973). In explaining the purpose of the legislation, Governor William T. Cahill stated that the statute would "encourage lawyers to consider a judicial career at an earlier age. Presently, in many instances, capable young lawyers are reluctant to give up a lucrative law practice and to accept a judicial appointment because of a disparity in pension benefits which exists among the various courts." *Ibid.*

The non-contributory nature of the JRS ended in 1982. That year, an amendment to the JRS Act imposed a pension contribution requirement on justices and judges. *See N.J.S.A.* 43:6A–34.1(b) (requiring three-percent deduction from "the amount of any difference between the salary on or after January 19, 1982, for any judicial position held by the member and the salary for that position on January 18, 1982"). At the same time, a bill was enacted that increased the salaries of all Supreme Court justices and Superior Court judges by $15,000. *L.* 1981, *c.* 473, § 1. Similar to what had been done not long after the 1947 Constitu-

---

salary increase in 1965 over the amount established at the time of their initial appointment as 1947 constitutional judicial officers, were subjected to a contributory requirement on the portion of their salary that represented the difference between the increased amount and the former amount. *See L.* 1965, *c.* 74, § 8 (imposing contributory requirement on portion of salary increase implemented by that amendatory legislation). The legislation provided that the affected justices and judges "shall have deducted from his salary for the use of the State 10% of the difference between the annual salary paid to the holder of his judicial office prior to the effective date of this amendment and his current annual salary, which deduction shall be mandatory and nonrefundable and shall be deducted from all salary payments made to such justices and judges subsequent to the effective date of this amendment." *L.* 1965, *c.* 74, § 8. The JRS Act repealed and retroactively eliminated that short-lived contributory requirement financed out of the increase in salary that had come into effect in 1965. *See L.* 1973, *c.* 140, § 46(g) (requiring reimbursement of said contributions made under repealed law).

tion's adoption with that short-lived contributory obligation imposed on certain justices and judges who had service both pre- and post-creation of the modern judicial system, *see supra* note 6, the contributory requirement was not permitted to diminish the salaries of current judges but rather was funded by the net increase in salary that accompanied the contributory obligation. Simply put, the net effect of passage of those laws in 1981 was that justices and judges began contributing three percent of their $15,000 salary increase to the JRS, and were further required to contribute three percent of all future salary increases.

It is particularly noteworthy that in the very first instance in which the Legislature imposed, briefly, a contribution requirement on certain judges carrying over service from pre–1947 Constitution judicial positions, the Legislature took pains carefully to segregate the new contributory requirement from the protected past level of salary. *See supra* note 6. That earliest example of legislative care, in 1965, to avoid transgressing the No–Diminution Clause set the stage for all subsequent contributory requirements for judges. *Ibid.* The same can be said about the imposition, for the first time, of a judicial contribution toward health benefits imposed in 1996 and the later change in contributions toward health care that occurred in 2007.

## B.

In 1996, an amendment to the State Health Benefits Program Act for the first time required judicial contribution to health care benefits, *L.* 1996, *c.* 8, § 3, but as with statutory changes requiring judicial contribution to the pension system, that amendment was preceded by a raise of approximately $15,000 to $19,000 (depending on position) in judicial salaries, *L.* 1995, *c.* 424, § 1. Although *L.* 1996, *c.* 8 did not initially quantify a specific contribution rate required of members of the judiciary, the preceding raise ensured that the amendment did not effect a reduction in the previous take-home pay of justices and judges. Subsequently, a 2007 amendment to the Act, effective June 28, 2007, mandated a contribution of one-and-one-half percent of base salary from all

state employees participating in the SHBP who were not represented by a majority representative. *L.* 2007, *c.* 103, § 22 (amending *N.J.S.A.* 52:14–17.28(b)). That amendment similarly coincided with an increase in judicial salaries implemented in three steps accruing on July 1, 2007, *see L.* 2007, *c.* 111 (implementing first step through language in FY 2008 Appropriations Act (S. Bill 3000 at 237)), January 1, 2008, and January 1, 2009, *see L.* 2007, *c.* 350, § 1 (implementing and codifying increased judicial salaries).

## C.

That history of legislative action reveals a clear adherence to the No–Diminution Clause's command. The Legislature and Executive have consistently avoided decreasing the take-home pay of sitting judges, thus honoring the No–Diminution Clause. Even most recently, in connection with the statute under challenge, a competing bill in the Legislature expressed the long-standing view that contribution increases to be exacted from judges could only be imposed in the future on newly appointed judges, not on currently sitting judges. *See* Assemb. 3796 (Sponsor's Statement), 214th Leg. (N.J.2011). Forbearance was described as a matter of constitutional demand, not as a legislative conferral of favor.

In sum, since ratification of New Jersey's 1947 Constitution and until enactment of Chapter 78, every legislative act increasing individual contributions to judicial pension or health care insurance plans was accomplished in combination with a salary increase for justices and judges, thus ensuring no net loss in take-home pay. Such a concert of action, over so long a period, is not a coincidence. It reflects an abiding understanding of and respect for the Clause's purpose of protecting and preserving judicial independence.

## IV.

### A.

The State contends that the New Jersey Constitution does not prohibit the Legislature from compelling sitting justices and

judges—"in a like manner as all other public employees"—to make increased contributions to their health care and pension plans even when the result is a decrease in their take-home salaries. The State contends that support for that proposition exists in federal case law. However, the federal case law is just to the contrary.

The historical application of the federal No–Diminution Clause reveals a line of cases that have prohibited salary reductions—with the sole exception of taxes that are borne by all citizens. Given United States Supreme Court precedent, the State's arguments to uphold Chapter 78 as applied to currently sitting judges would never pass muster under the federal No–Diminution Clause.

## B.

The Supreme Court has declared in a case involving federal cost of living adjustments (COLAs) that no reduction in the compensation of federal judges is permissible.

In *United States v. Will,* 449 *U.S.* 200, 101 *S.Ct.* 471, 66 *L.Ed.*2d 392 (1980), the Court considered acts of Congress taken to block COLAs for federal judges before they went into effect, and other acts that purported to repeal COLAs that either were close to taking effect or had taken effect. *Id.* at 202, 101 *S.Ct.* at 474, 66 *L.Ed.*2d at 398. The Court described the issue before it as "decid[ing] when a salary increase authorized by Congress under such a formula 'vests'—*i.e.,* becomes irreversible under the Compensation [or No–Diminution] Clause." *Id.* at 221, 101 *S.Ct.* at 483, 66 *L.Ed.*2d at 409. The Court held that the cost of living increases vested when they took effect as law. *Id.* at 229, 101 *S.Ct.* at 487, 66 *L.Ed.*2d at 414. Therefore, in those years in which the repeals were signed into law after the COLAs had already taken legal effect, the Court held that the repeals violated the federal No–Diminution Clause. *Id.* at 226, 230, 101 *S.Ct.* at 486, 488, 66 *L.Ed.*2d at 413, 415. In enforcing the No–Diminution Clause's prohibition, the Court explained that the constitutionally compelled outcome was not affected by the fact that other government officials also were impacted by the freeze of cost of living

increases. That was so because "[t]he inclusion in the freeze of other officials who are not protected by the [No–Diminution] Clause does not insulate a direct diminution in judges' salaries from the clear mandate of that Clause; the Constitution makes no exceptions for 'nondiscriminatory' reductions." *Id.* at 226, 101 *S.Ct.* at 486, 66 *L.Ed.*2d at 412.

State courts have taken a similar approach, treating judicial salary adjustments that already had taken effect in law as beyond the legislature's ability to repeal or diminish. *See Jorgensen v. Blagojevich,* 211 *Ill.*2d 286, 285 *Ill.Dec.* 165, 811 *N.E.*2d 652, 663 (2004); *Stilp, supra,* 905 *A.*2d at 939. In each, the legislative effort to repeal an operative law granting an adjustment was held to be a direct diminution in judicial compensation. *See Jorgensen, supra,* 285 *Ill.Dec.* 165, 811 *N.E.*2d at 669; *Stilp, supra,* 905 *A.*2d at 939; *see also Hudson v. Johnstone,* 660 *P.*2d 1180, 1185 (Alaska 1983) (holding that "the legislature, in implementing a contributory judicial retirement system, could not constitutionally require members of the judiciary already in office to contribute to such a system via a salary deduction" without violating state constitutional proscription against diminution in compensation).

Clearly, the State can point to no support in United States Supreme Court case law for its proposition that a diminution in judicial salary—however it may be characterized—passes constitutional muster.

## C.

The Supreme Court also has addressed the impact of taxing statutes on the salaries of sitting judges. In this line of cases, the United States Supreme Court has carved out only one exception—for general taxes—to the No–Diminution Clause's prohibition.

In *Hatter, supra,* the plaintiff judges challenged the constitutionality of subjecting federal judges to Medicare and Social Security taxes, from which they had been previously exempt. 532 *U.S.* at 561–64, 121 *S.Ct.* at 1787–89, 149 *L.Ed.*2d at 827–30. The Court declared that "[t]here is no good reason why a judge should

not share the tax burdens borne by all citizens." *Id.* at 571, 121 *S.Ct.* at 1792, 149 *L.Ed.*2d at 834. A nondiscriminatory tax borne by all citizens was not viewed as the type of threat to judicial independence that the Clause was designed to curb. *Ibid.* That said, the Court reiterated that

> the [No–Diminution] Clause offers protections that extend beyond a legislative effort directly to diminish a judge's pay, say, by ordering a lower salary. Otherwise a legislature could circumvent even the most basic [No–Diminution] Clause protection by enacting a discriminatory tax law, for example, that precisely but indirectly achieved the forbidden effect.
>
> [*Id.* at 569, 121 *S.Ct.* at 1791, 149 *L.Ed.*2d at 833 (citation omitted).]

Ultimately, because the Medicare tax was imposed by Congress equally as between the judges and the rest of the citizenry, the Court concluded that it was constitutional. *Id.* at 572, 121 *S.Ct.* at 1793, 149 *L.Ed.*2d at 834. However, the Court found that the Social Security tax impermissibly discriminated against judges and violated the No–Diminution Clause for a variety of reasons. *See id.* at 572–76, 121 *S.Ct.* at 1793–95, 149 *L.Ed.*2d at 835–37.

Importantly, the Supreme Court in the *Hatter* decision rejected the government's argument that "Article III protects judges only against a reduction in stated salary, not against indirect measures that only reduce take-home pay." *Id.* at 576, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 837. The Court also reasserted that legislative intent is irrelevant, whether benign or not, in determining the constitutionality of a reduction in judicial salary. The Court noted that it had "never insisted upon such evidence" and that "[t]o require it is to invite engendering suspicion among the branches and consequently undermining that mutual respect that the Constitution demands." *Id.* at 577, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 838.

The State's reliance on *Hatter* is based on a misinterpretation of that decision. Additionally, the State's position finds no support elsewhere in case law. The State has not cited any decisions of a state court of last resort construing a similar state constitution's no-diminution clause that has upheld a direct or indirect reduction

in a sitting judge's compensation. *See, e.g., Jorgensen, supra*, 285 *Ill.Dec.* 165, 811 *N.E.*2d at 661–62.

### D.

■ In sum, we find no support in federal precedent for the constitutionality of Chapter 78. The United States Supreme Court has never given any signal that even an indirect reduction in a judge's salary during the term of his appointment would be tolerable under the Federal Constitution—with one exception. That sole exception is that federal judges, like all citizens, must pay nondiscriminatory taxes even if those judges were appointed before enactment of the tax. *See Hatter, supra*, 532 *U.S.* at 571–72, 121 *S.Ct.* at 1792, 149 *L.Ed.*2d at 834. Moreover, the Supreme Court has not varied from its pronouncement that the reduction of public employees' compensation in general "does not insulate a direct diminution in judges' salaries from the clear mandate of that Clause; the Constitution makes no exceptions for 'nondiscriminatory' reductions." *Will, supra*, 449 *U.S.* at 226, 101 *S.Ct.* at 486, 66 *L.Ed.*2d at 412.

This is not a situation where the State, through legislative action, has asked judges to shoulder a *tax* burden that is shared in common with citizens of New Jersey generally. Instead, Chapter 78 is an employer-generated reduction in the take-home salaries of justices and judges during the terms of their appointments—a direct violation of the No–Diminution Clause of our State Constitution. This is the first piece of legislation that has attempted to diminish the salaries of sitting justices and judges through salary deductions since the enactment of the 1947 Constitution. The State has not cited to any earlier like legislation in the history of this State.

### V.

We offer a few observations on the views expressed by our dissenting colleagues.

Our dissenting colleagues perceive that in striking down Chapter 78 as unconstitutional we have not afforded proper deference to the power of the Legislature to act in the field of economic regulation. We do not dispute the right of the Legislature to make and to implement policy choices as it deals with critical issues confronting this State. Those policy choices, however, must be made within a constitutional framework and it is the obligation of the judicial branch to insist that that framework be respected and observed. That framework includes Article VI's express limitation on the exercise of legislative power.

In conducting our analysis, we have accepted that plaintiff bears the burden of demonstrating the unconstitutionality of Chapter 78. We know that statutes are presumed to be constitutional. We did not encumber our opinion with legal principles that are not in dispute.

To the extent that our dissenting colleagues question the relevance of federal case law, we note that our discussion of this subject is entirely appropriate because our Constitution's protection against the diminution of judicial salaries finds its genesis in the United States Constitution. *See Vreeland v. Byrne,* 72 *N.J.* 292, 306, 370 *A.*2d 825 (1977). That is why, we suppose, the State rested a substantial portion of its argument on federal case law. That said, we emphasize that *Hatter, supra,* provides no support for the argument that Chapter 78 is constitutional. In *Hatter,* the Supreme Court dealt with a tax, enacted by Congress upon all citizens in an exercise of its power as a sovereign. We deal here with contributions exacted by the State in its role, not as sovereign, but as employer.

We are fully cognizant of the serious fiscal issues that confront the State and that led to the passage of Chapter 78. We recognize that those issues require resolution. The Framers understood that the future fiscal affairs of our State could not be predicted and therefore refused to prescribe in the Constitution a set dollar amount to either judicial pay or pension. That is the essential point made in comments by delegate members, Nathan

Jacobs and Wayne McMurray. *See* 1 *Proceedings of the Constitutional Convention of 1947,* at 475, 501–02. That wise decision by the Framers in no way is inconsistent with the concomitant recognition that the pay of sitting judges cannot be reduced or diminished during their service.

Simply stated, any solution to the State's serious fiscal issues must conform to the requirements of our Constitution.

## VI.

We recognize that Chapter 78 generally serves a legitimate public policy goal. But that goal, as applied to justices and judges, must be achieved through constitutional means. The Framers of the 1947 Constitution gave protection to justices and judges that they did not give to other state employees because of the need to promote and preserve judicial independence. The Framers were zealous in their desire for an independent judiciary. *See In re Boggia,* 203 *N.J.* 1, 8, 998 *A.*2d 949 (2010).

The New Jersey Constitution and the United States Constitution both make the judiciary an independent, co-equal branch of government, the branch that is charged with ensuring that every law adheres to the basic precepts of the Constitution. We can no more uphold a law that violates the Judicial Article of the Constitution than one that violates the right to free speech or freedom of the press or the right to due process and equal protection. A Court that cannot protect its own independence is not one that can be counted on to protect the fundamental rights of others in challenging times. Significantly, the State cannot point to another high court in any jurisdiction with a similar constitutional no-diminution clause that has upheld legislation reducing the take-home salary or compensation of judges during their appointment to office by compelling greater pension or health care contributions.

Like other state employees, the men and women who serve as justices and judges are dedicated public servants. Like other

state employees, justices and judges make pension and health care contributions. All justices and judges appointed after enactment of Chapter 78 are subject to the increased pension and health care contributions it requires. As to justices and judges in service at the time of Chapter 78's enactment, the deductions required by that law can be carved out of any future salary increase going forward, thus avoiding the diminution prohibited by the Constitution.

We do not question the good motives of the Legislature in passing Chapter 78. We do not presume that Chapter 78 was passed in an attempt to intimidate or influence the judiciary. *See Hatter, supra,* 532 *U.S.* at 577, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 838. However, whatever good motivation the Legislature may have had when enacting Chapter 78 with its broad application to all state public employees, the Framers' message is clear. The Constitution forbids the reduction of a justice or judge's take-home salary during the term of his or her appointment.

We hold that Chapter 78 violates Article VI, Section 6, Paragraph 6 of the 1947 New Jersey Constitution as applied to state justices and judges holding office at the time of its enactment.

## VII.

The judgment of the Law Division is affirmed.

Justice PATTERSON, dissenting.

Today, the Court strikes down the Legislature's comprehensive pension and health benefit reform, *L.* 2011, *c.* 78 (Chapter 78), as it applies to a narrow class of New Jersey's public employees, Justices of the Supreme Court and Judges of the Superior Court whose judicial terms began before the law's enactment. The majority holds that Chapter 78 reduces the "salaries" of justices and judges within the meaning of Article VI, Section 6, Paragraph 6 of the New Jersey Constitution. *Ante* at 43, 65, 47 *A.*3d at 692, 705. It holds that the Legislature may only increase pension and health benefit contributions of justices and judges if it grants to

them a pay raise that nullifies the financial impact of any added contributions. *Id.* at 64–65, 47 *A.*3d at 705.

I respectfully disagree with the majority's analysis and conclusion. The judiciary traditionally reviews legislative enactments with the greatest measure of deference, respecting our coordinate branch's authority to set policy in response to the evolving challenges that face our State. Particularly in matters of fiscal policy, legislation enjoys a strong presumption of constitutionality, and our jurisprudence teaches that a statute should not be invalidated unless it is found, beyond a reasonable doubt, to violate our Constitution.

With due respect to the majority, I find no basis for such a finding in this case. There is, in my view, nothing in either the pertinent text of the Constitution or the deliberations of its Framers that supports the majority's holding, and much that contravenes it. Beginning with the plain language of the constitutional provision, in Article VI, Section 6, Paragraph 6 of the New Jersey Constitution, the Framers chose the term "salaries"—not "compensation," not "emoluments," not "benefits," not "pensions." That term, in 1947 and today, has a specific meaning that excludes the concept of contributions for pension and health benefits. Accordingly, I consider the plain language of the constitutional provision to defeat plaintiff's claim. Resort to the record of the Constitutional Convention confirms that view. The record contains no specific discussion of the constitutional Framers' intent when it chose the term "salaries"—an absence of direct evidence that should be construed against plaintiff, who bears the heavy burden in this case. The Framers' discussion of related provisions regarding judicial pensions reveals their unequivocal intent that the Legislature not be constrained by constitutional language from effective response to economic conditions.

Rather than look to the plain language or even to the relevant extrinsic sources, the majority's opinion rests on two foundations: its interpretation of federal law and its invocation of the principle of judicial independence. I respectfully disagree with the majori-

ty's reliance on federal law. There is no federal decision that directly addresses the issue presented by this case; the United States Supreme Court decisions construe a provision of the United States Constitution that involves "compensation," not "salaries," and no such decision reviews a pension and benefit statute such as Chapter 78 as applied to judges. Yet the general principles articulated by the Supreme Court in these cases support the constitutionality of Chapter 78, as they confirm that a non-discriminatory general statute does not run afoul of the federal Compensation Clause even if it indirectly affects the "compensation" of a judge. Properly construed, federal law does not buttress the majority's holding.

The majority correctly recognizes that judicial independence was a primary concern of the Framers, and is a guiding principle for justices and judges as we serve our State today. In my view, Chapter 78 cannot be viewed as an attack on judicial independence, by intent or in effect. We consider a law that governs the pension and health benefit contributions of more than one-half million state and local government employees. It does not discriminate against justices and judges. I cannot agree with the majority that judicial independence is under assault, or even implicated, by virtue of the Legislature's action. Chapter 78 is, in my opinion, in full accord with our Constitution.

Accordingly, I respectfully dissent.

I.

The 1947 Constitution vests lawmaking power in the Legislature. *N.J. Const.* art. IV, § 1, ¶ 1. The Legislature's exercise of that power, as it addresses the complex challenges of our State, is entitled to substantial deference. As this Court has noted:

> An observation made by Justice Holmes nearly a century ago is applicable to the present case. "Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

[*Hamilton Amusement Ctr. v. Verniero*, 156 *N.J.* 254, 285, 716 *A.*2d 1137 (1998) (quoting *Mo., Kan., & Tex. Ry. Co. v. May*, 194 *U.S.* 267, 270, 24 *S.Ct.* 638, 639, 48 *L.Ed.* 971, 973 (1904)), *cert. denied*, 527 *U.S.* 1021, 119 *S.Ct.* 2365, 144 *L.Ed.*2d 770 (1999).]

"Legislatures are entitled to experiment and explore means through which to advance public policy, provided there is a reasonable basis to support the legislation." *Caviglia v. Royal Tours of Am.*, 178 *N.J.* 460, 477, 842 *A.*2d 125 (2004).

The Legislature's role in shaping policy compels an extraordinarily deferential standard of judicial review, born of the Framers' respect for the relationship between legislators and the citizens who elect them. As Justice Francis wrote in *New Jersey Sports & Exposition Authority v. McCrane:*

> In our tripartite form of government [judicial review of legislation] has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature.... [A]ll the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution.
>
> [61 *N.J.* 1, 8, 292 *A.*2d 545 (citing *Roe v. Kervick*, 42 *N.J.* 191, 229, 199 *A.*2d 834 (1964)), *appeal dismissed sub nom. Borough of E. Rutherford v. N.J. Sports & Exposition Auth.*, 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972).]

Legislation is thus " 'presumed to be constitutional.' " *Lewis v. Harris*, 188 *N.J.* 415, 459, 908 *A.*2d 196 (2006) (quoting *Caviglia, supra*, 178 *N.J.* at 477, 842 *A.*2d 125). When a constitutional provision is invoked to challenge an enactment, only an unmistakable conflict between the Framers' language and the challenged law warrants a decision striking down the Legislature's act:

> [I]t is the settled rule of judicial policy in this State that a legislative act will not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt. The constitutional limitation upon the exercise of legislative power must be clear and imperative; there is to be no forced or unnatural construction; the limitation upon the general legislative power is to be established and defined by words that are found written in that instrument, and not by reference to some spirit that is supposed to pervade it or to underlie it.
>
> [*Gangemi v. Berry*, 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957) (quotations omitted).]

*See also LaManna v. Proformance Ins. Co.,* 184 *N.J.* 214, 223, 876 *A.*2d 785 (2005); *State v. Trump Hotels & Casino Resorts, Inc.,* 160 *N.J.* 505, 526, 734 *A.*2d 1160 (1999). Given the burden of proving the unconstitutionality of a statute beyond a reasonable doubt, unless a fundamental right or suspect class is implicated, the governing standard of review calls for judicial deference absent the clearest conflict between a constitutional mandate and the disputed law.

Deference to the Legislature is particularly appropriate in the field of economic regulation, in which the Constitution has assigned to the Legislature a pivotal role. *See Edgewater Inv. Assocs. v. Borough of Edgewater,* 103 *N.J.* 227, 235, 510 *A.*2d 1178 (1986) ("[I]n reviewing economic and social regulation ... courts properly defer to the legislative judgment as to the necessity and reasonableness of a particular measure." (quotation omitted)). The presumption of validity afforded to determinations of the Legislature "is particularly strong in the realm of economic legislation 'adjusting the benefits and burdens of economic life.'" *N.J. Ass'n of Health Plans v. Farmer,* 342 *N.J.Super.* 536, 551, 777 *A.*2d 385 (Ch.Div.2000) (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 *U.S.* 1, 15, 96 *S.Ct.* 2882, 2892, 49 *L.Ed.*2d 752, 766 (1976)).

In my view, the standard of review that governs this case should distill the analysis to a simple inquiry: has plaintiff demonstrated, beyond a reasonable doubt, that Article VI, Section 6, Paragraph 6 of the Constitution was intended by its Framers to preclude legislatively mandated increases in contributions for pension and health benefits in the course of a judicial term? I respectfully submit that the clear answer to that question is no. In my view, the majority imposes the burden on the wrong party, citing the State's purported failure to present dispositive evidence of the Framers' intent and the absence of federal case law on point, against the State as if it were the State's burden to justify the constitutionality of Chapter 78. *Ante* at 51–53, 60–61, 47 *A.*3d at 697–98, 703.

Given that the burden rests on the plaintiff, not on the State, I respectfully submit that neither the plain language of the provision nor the extrinsic evidence of its meaning reveal any intent by the Framers to bar legislative adjustments to judicial pension and health benefits—let alone satisfy the extraordinary standard of proof beyond a reasonable doubt.

## II.

The plain language of Article VI, Section 6, Paragraph 6 of our Constitution must be construed with meticulous attention to the Framers' choice of words. As we held in *State v. Apportionment Commission:*

> That the words employed in the Constitution have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication is presumed. We should therefore inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding for the Constitution was written to be understood by the voters.
>
> [125 *N.J.* 375, 382, 593 *A.2d* 710 (1991) (citations and quotations omitted).]

Our Constitution "is, above all, an embodiment of the will of the People, and this Court's responsibility as final expositor is to ascertain and enforce that mandate." *Gallenthin Realty Dev., Inc. v. Borough of Paulsboro,* 191 *N.J.* 344, 359, 924 *A.2d* 447 (2007) (citing *Bd. of Chosen Freeholders of Morris v. State,* 159 *N.J.* 565, 575–76, 732 *A.2d* 1053 (1999)). The "surest indicator of that intent is a provision's plain language." *Ibid.* (citing *Gangemi, supra,* 25 *N.J.* at 10, 134 *A.2d* 1). In the event of an ambiguity, "constitutional language should be construed narrowly because of [the] fundamental principle that people should select those by whom they will be governed." *Gilbert v. Gladden,* 87 *N.J.* 275, 291 n. 1, 432 *A.2d* 1351 (1981) (citing *Powell v. McCormack,* 395 *U.S.* 486, 547, 89 *S.Ct.* 1944, 1977, 23 *L.Ed.2d* 491, 531 (1969)).

The provision in dispute here consists of a concise sentence: justices and judges "shall receive for their services such salaries as may be provided by law, which shall not be diminished during the term of their appointment." *N.J. Const.* art. VI, § 6, ¶ 6. The

plain language issue before us concerns the meaning of a single word, "salaries."

In that inquiry, we can rely upon the definition of the word that was accepted at the relevant time. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 *U.S.* 37, 42, 100 *S.Ct.* 311, 314, 62 *L.Ed.*2d 199, 204 (1979).

In the version of *Black's Law Dictionary* that most closely preceded the 1947 Constitutional Convention, "salary" is defined as follows:

SALARY. A reward or recompense for services performed. In a more limited sense salary is a fixed periodical compensation paid for services rendered; a stated compensation, amounting to so much by the year, month, or other fixed period, to be paid to public officers and persons in some private employments, for the performance of official duties or the rendering of services of a particular kind, more or less definitely described, involving professional knowledge or skill, or at least employment above the grade of menial or mechanical labor. . . . The word "salary," is synonymous with "wages," except that "salary" is sometimes understood to relate to compensation for official or other services, as distinguished from "wages," which is the compensation for labor.

[*Black's Law Dictionary* 1576 (3d ed. 1933).]

In the version of *Black's Law Dictionary*, published ten years after the Constitutional Convention, the definition of "salary" similarly denoted a set amount of money paid for a specific period of service. *Black's Law Dictionary* 1503 (4th ed. 1957). This contemporaneous definition of the term "salary" as a fixed periodic amount of money paid on an annual or other regular time interval as applied to public officials is reflected in legislation enacted shortly after the ratification of our Constitution. *See, e.g., L.* 1955, c. 273, § 1 (fixing "annual salary of $16,000.00" for "each judge of a county district court"); *L.* 1959, c. 48, § 1 (stating that justices and judges "shall receive an annual salary in an amount $2,000.00 greater than is now provided by law").

It is also important to consider the use of the term "salary" in other provisions of the 1947 Constitution. The drafters of our Constitution used the term three times: in the clause at issue,

Article VI, Section 6, Paragraph 6, in a corresponding provision that afforded to the Governor "a salary, which shall be neither increased nor diminished during the period for which he shall have been elected," *N.J. Const.* art. V, § 1, ¶ 10, and in a third provision addressing public employee "compensation for services and fees." That third clause provides:

> Any compensation for services or any fees received by any person by virtue of an appointive State office or position, in addition to the annual salary provided for the office or position, shall immediately upon receipt be paid into the treasury of the State, unless the compensation or fees shall be allowed or appropriated to him by law.
>
> [*N.J. Const.* art. VII, § 1, ¶ 3.]

Thus, the Framers viewed a public employee's "annual salary" as a component—but not the entirety—of his or her potential "compensation for services or [ ] fees received" and permitted such employees to retain compensation in excess of "annual salary" only to the extent authorized by law. *Ibid.*

The plain meaning of the term "salaries"—as a concept distinct from and independent of pension and health benefits—was underscored by a 1992 amendment to the Judicial Article that, among other provisions, required the State to bear "certain judicial and probation costs." *N.J. Const.* art. VI, § 8, ¶ 1. The amendment specifically differentiated between "salaries," "health benefits" and "pension payments" in its definition of "judicial costs":

> "Judicial costs" means the costs incurred by the county for funding the judicial system, including but not limited to the following costs: salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs, except that judicial costs shall not include costs incurred by employees of the surrogate's office or judicial facility costs.
>
> [*N.J. Const.* art. VI, § 8, ¶ 1(b)(3).]

The drafters of the 1992 amendment clearly understood "salaries" to exclude "health benefits and pension payments" of judicial employees, and accordingly listed them as separate items as part of the definition in this amendment to the Judicial Article.

In my view, the term "salaries"—as used at the time that our Constitution was drafted, and as used today—conveys a concept that is substantially narrower than other terms that could have

been selected by the Framers. It means the amount paid to a public official or other employee for his or her work, per year, per month, per week or for such other period that may govern the employment relationship.

The significance of the drafters' choice of the limited term "salaries" is confirmed by the fact that it represented a change in terminology from the corresponding provision in the 1844 Constitution, in which the word "compensation" appears. *See N.J. Const. of 1844* art. VI, § 2, ¶ 3 (providing that judges of the court of errors and appeals "shall receive . . . a per diem compensation, to be provided by law"); *N.J. Const. of 1844* art. VII, § 2, ¶ 1 ("The justices of the supreme court and chancellor . . . shall, at stated times, receive for their services a compensation, which shall not be diminished during the term of their appointments.").

Here, the Framers rejected the term "compensation" that had been part of our State Constitution for more than a century, and decided on the word "salaries" for the modern Constitution drafted in 1947. *N.J. Const.* art. VI, § 6, ¶ 6. The majority suggests that because the terms "salary" and "compensation" are used in various provisions of the 1947 Constitution, they should be considered interchangeable. *Ante* at 52–53, 47 *A.*3d at 698. However, the rules that govern the construction of constitutional language instead support the opposite conclusion. The drafters of our Constitution can be presumed to have accorded different meanings to the two terms, and to have chosen for Article VI, Section 6, Paragraph 6 the word that most precisely conveyed their intent, "salaries."[1] *See* Norman J. Singer & J.D. Shambie Singer, 2A *Sutherland Statutory Construction* § 46:6, at 250–52 (7th ed. 2007) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended. In like manner, where the

---

[1] In 1949—two years after the adoption of our Constitution—when setting the annual salary for judges, the Legislature understood "salaries" to be distinct from any "additional compensation" that it could provide to judges. *See L.* 1949, *c.* 257, § 5 (setting salaries for judges).

legislature has employed a term in one place and excluded it in another, it should not be implied where excluded.").

The majority, finding no evidence as to the reason for the Framers' change in language from "compensation" to "salaries," concludes that it must have been insignificant. *Ante* at 51–53, 47 *A.*3d at 697–98. Yet under established principles of statutory construction, amendments that alter language are not presumptively ignored. *See* Norman J. Singer & J.D. Shambie Singer, 1A *Sutherland Statutory Construction* § 22:30, at 362 (7th ed. 2009) ("[A]n amendment substituting a new term or phrase for one previously construed indicates that the judicial or executive construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given to the new term or phrase.").

The majority further concludes that the Framers must have used the term "salaries" to encompass the entire compensation package of a justice or a judge. *Ante* at 52–53, 47 *A.*3d at 698. Yet within the Constitution itself, the Framers chose specific words to define the various components of the salary and benefits package paid to public employees. One such term used by the Framers was "emolument," which clearly has a more expansive meaning than "salary" as it was defined by the Framers' contemporaries before and after the 1947 Constitutional Convention:

> EMOLUMENT. The profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office as salary, fees, and perquisites; advantage; gain, public or private. Webster. Any perquisite, advantage, profit, or gain arising from the possession of an office.
>
> [*Black's Law Dictionary* 656 (3d ed. 1933).] [2]

"Emolument" thus encompasses the term "perquisites," defined as "[e]moluments or incidental profits attaching to an office or official position, beyond the salary or regular fees." *Id.* at 1354.

---

[2] The next edition of *Black's Law Dictionary* following the 1947 Constitutional Convention includes the same definition. *Black's Law Dictionary* 616 (4th ed. 1957).

The term "emolument" was thus available to the Framers, had they intended to include in Article VI, Section 6, Paragraph 6 a constitutional bar on diminution of payments to justices and judges beyond their periodic "salaries." "Emolument" was used in several provisions of the 1947 Constitution to broadly describe the various forms of public employee compensation. For example, the Framers precluded legislators from receiving any "allowance or emolument" beyond their statutory "compensation." *N.J. Const.* art. IV, § 4, ¶ 7. The Framers further prohibited a legislator from holding "State civil office or position, of profit, which shall have been created by law, or the emoluments whereof shall have been increased by law, during [the legislator's] term." *N.J. Const.* art. IV, § 5, ¶ 1. The Framers similarly barred private, special or local laws "[c]reating, increasing or decreasing the emoluments, term or tenure rights of any public officers or employees." *N.J. Const.* art. IV, § 7, ¶ 9; *see also Vreeland v. Byrne,* 72 *N.J.* 292, 297–98, 370 *A.*2d 825 (1977). The 1947 constitutional provisions for the shift of authority to other public officials in the event of the Governor's inability to exercise the authority of his or her office, and for a gubernatorial vacancy, speak of the "functions, powers, duties and emoluments" of the Governor's office. *N.J. Const.* art. V, § 1, ¶ 7.

Since 1897, Delaware has used the word "emoluments" in its constitutional provision, which states: "No law shall extend the term of any public officer or diminish the salary or emoluments after his or her election or appointment." *Del. Const.* art. XV, § 4. Notwithstanding a neighboring state's adoption of a clause precluding the diminution of a public officer's "salary or emoluments" during his or her term, New Jersey's Framers declined to incorporate that inclusive phrase.

In short, the Framers were familiar with the term "emoluments"—broadly describing the panoply of financial payments and benefits provided to public employees—and selected it to be used in several provisions of our Constitution. However, the Framers chose not to use that term in the provision before the Court.

The Framers were also familiar with the term "pension." As applied to public employees in New Jersey, a pension is typically defined as "payments for life derived from appropriations made by the employer." *N.J.S.A.* 43:15A–6(k); *L.* 1954, *c.* 84, § 6. In the very section of the Constitution that is disputed here, the Framers determined that "[p]rovisions for the pensioning of the Justices of the Supreme Court and the Judges of the Superior Court shall be made by law." *N.J. Const.* art. VI, § 6, ¶ 3; *see also N.J. Const.* art. VI, § 6, ¶ 5 (providing that substantially incapacitated justices or judges can be retired from office "on pension as may be provided by law"). Our Constitution does not address a judicial pension as a component of a judicial "salary," but as an independent concept, and the Framers chose to exclude the term "pensions" from the provision at issue here. *Compare N.J. Const.* art. VI, § 6, ¶ 3, *with N.J. Const.* art. VI, § 6, ¶ 6.[3] Likewise, the law enacting the judicial pension scheme in 1948 referenced "salary" and "pension" as distinct forms of compensation. *See L.* 1948, *c.* 391, § 1 (explaining that each justice or judge "shall be paid thereafter an annual pension during the remainder of his natural life in an amount equal to three-fourths of the annual salary received by him at the time of his retirement").

In short, the Framers were fully familiar with language that would describe pension and health benefits when they drafted Article VI, Section 6, Paragraph 6 of the New Jersey Constitution. Yet in that provision, the Framers did not choose an expansive term to describe the scope of the constitutional constraint on legislative adjustments during a judicial term. The Framers did not choose language such as "salaries or benefits," "salaries or

---

[3] Our case law supports this principle that salary and pension are distinct forms of compensation. *See, e.g., Chamber of Commerce of E. Union Cnty. v. Leone,* 141 *N.J.Super.* 114, 142, 357 *A.2d* 311 (Ch.Div.1976) ("[I]t appears that [the Legislative Pension Act of 1972, *N.J.S.A.* 43:15A–135 to –140] should be viewed as providing that each year, regardless of the then governing amount of salary, a legislator receives additional compensation, which compensation consists of the right to a pension to be computed and ultimately paid according to the statutory formula."), *aff'd o.b.,* 75 *N.J.* 319, 382 *A.2d* 381 (1978).

pension benefits" or "salaries or health benefits." The constitutional restraint on the Legislature is limited; it restricts that body from diminishing "salaries" alone.

In my view, the plain language of the constitutional provision at issue reflects the Framers' cautious approach to a rare constraint on legislative power. I cannot share the majority's reading of the term "salaries" to encompass judicial pensions or health benefits, given the contemporaneous definition and usage of that word. Nothing in the language of the Constitution, the relevant statutes, or the case law of the time suggests that the term "salaries" in Article VI, Section 6, Paragraph 6 of the New Jersey Constitution was intended to encompass benefits such as post-retirement pension payments or health care coverage, or was somehow interchangeable with broader terms that could have been chosen, but were not. I consider the plain language of Article VI, Section 6, Paragraph 6 of the New Jersey Constitution to confirm the constitutionality of Chapter 78.

### III.

Even if the Framers' intent were not clearly revealed by the plain language of the provision at issue—as I conclude that it is here—"a court may look to sources beyond the Constitution itself to ascertain the fundamental purpose underlying the language." *Gallenthin, supra,* 191 *N.J.* at 359, 924 *A.*2d 447 (quotation omitted); *see also Trump Hotels & Casino, supra,* 160 *N.J.* at 527–28, 734 *A.*2d 1160 ("[I]f the language of the constitutional provision is unclear or is susceptible to more than one interpretation, courts may consider sources beyond the instrument itself to ascertain its intent and purpose."); *Lloyd v. Vermeulen,* 22 *N.J.* 200, 206, 125 *A.*2d 393 (1956) ("[S]ince words are inexact tools at best, resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used."). The majority concludes that the proceedings of the 1947 Constitutional Convention support its construction of the provision at issue. I respectfully disagree.

Charged with the responsibility of drafting the Judicial Article—the framework for a bold and comprehensive reform of our State's court system—the 1947 Constitutional Convention's Committee on the Judiciary held seventeen days of hearings in June and July 1947. *4 Proceedings of the Constitutional Convention of 1947*, at iii. The transcript of those hearings documents the painstaking process conducted by the Committee's twelve members, who sought the advice of prominent lawyers, judges and law professors from New Jersey and other states, as well as citizens of our State who were interested in the improvement of our courts. The record of the Constitutional Convention proceedings that led to the Judicial Article (adopted as Article 6 in our Constitution) provides a wealth of information about the Framers' objectives when they chose the words of many significant constitutional provisions.

Yet that record is devoid of even a passing discussion of the language at the center of this case. Nowhere in the Committee on the Judiciary's hearings can we find a suggestion that pension and health benefits should be considered "salaries" for purposes of Article VI, Section 6, Paragraph 6 of the New Jersey Constitution, let alone the clear direction from the Framers that the standard of review demands. There is no discussion of the Framers' substitution of the word "salaries" in Article VI, Section 6, Paragraph 6 for the word "compensation" found in the predecessor clause in the 1844 Constitution. There is no suggestion in the testimony of the witnesses, let alone in the statements of the drafters themselves, that they envisioned constitutional constraints on anything other than legislative diminution of statutorily-established salaries of justices and judges.[4] Indeed, as explained below, there are

---

[4] Notwithstanding the majority's suggestion that the absence of a direct discussion of Article VI, Section 6, Paragraph 6 should be construed against the State, *ante* at 51–53, 47 A.3d at 697–98, the absence of precise evidence on that point should defeat plaintiff's attack on Chapter 78, given the clear burden on plaintiff to prove beyond a reasonable doubt that the statute is unconstitutional. *See LaManna, supra,* 184 *N.J.* at 223, 876 A.2d 785; *Trump Hotels & Casino, supra,* 160 *N.J.* at 526, 734 A.2d 1160.

strong indications in the Framers' exploration of pension provisions that the Legislature acted as the Framers envisioned when it enacted Chapter 78.

Like the trial court, the majority relies upon references from the Convention's proceedings as evidence of the Framers' intention to preclude the Legislature from increasing the pension and health benefit contributions of justices and judges. First, it cites Governor Alfred E. Driscoll's eloquent comments about the importance of a " 'strong, competent, easily functioning, but always independent, judiciary, and, therefore, in a position to curb any tendency on the part of the other two branches of government to exceed their constitutional authority.' " *Ante* at 51, 47 *A*.3d at 697 (quoting 4 *Proceedings of the Constitutional Convention of 1947*, at 428–29). Significantly, Governor Driscoll accompanied his statement of principle with concrete proposals for ensuring an independent, strong and efficient judiciary—none of those proposals suggesting support for the majority's conclusion:

And how may we best acquire this independent judiciary that your Governor so greatly wants and I am sure our citizens require? First and foremost, it seems to me that the members of our judiciary should be appointed for long terms, preferably given life tenure. The alternative, however, to life tenure would in my judgment be to provide for initial appointments of anywhere from seven to ten years, with a judge having life tenure following a reappointment and confirmation, of course, by the Senate in both instances. That will do more, in my judgment, to insure the independence of the judiciary than anything else.

Provision should be made for the retirement of the judges, perhaps at 70, certainly not later than 75. The particular details with respect to retirement need not in my opinion be incorporated, and I don't think should be incorporated, in the Constitution. However, this Convention might very well recommend to the Governor and the Legislature what, in its collective opinion, should be done with respect to retirement.

[4 *Proceedings of the Constitutional Convention of 1947*, at 429.]

Governor Driscoll then addressed the need for a uniform system of judicial selection to promote judicial competency and independence, *id.* at 429, proposing "appointment by the Governor subject to senatorial confirmation, either with or without the assistance of a selection commission," *id.* at 430. He proposed a redesigned structure for New Jersey's court system, engaging in an extensive exchange with the Committee about the concrete steps that he

considered necessary to ensure an independent and effective judiciary. *See generally id.* at 427–45.

Nowhere in Governor Driscoll's testimony at the Constitutional Convention did he suggest that he considered constraints on the Legislature's control over judicial pension and health benefits to be essential—or even relevant—to judicial independence. Indeed, Governor Driscoll's proposal that the details of judicial retirement be left to the Executive and Legislative branches, rather than incorporated in the Constitution, reflects a broader theme in his message to the Framers. The Governor sought to strengthen not only the newly reformed judiciary, but the Executive and Legislative branches as well, invoking principles of separation of powers to ensure flexibility in all three branches' approach to evolving circumstances. As he testified before the Convention's Committee on the Executive, Militia and Civil Officers on June 24, 1947:

> At the outset I would like to emphasize that my interest is in the entire Constitution, rather than a particular portion. I would strengthen each of the basic branches of the Government: Executive, Legislative, Judicial; and in doing so retain the traditional checks and balances that make our form of government unique among the governments of the world.
>
> A constitution should allocate authority; it should not prescribe detail. Accordingly, I would suggest that we return to the basic principles of 1787, without the encumbering, frequently cumbersome, and occasionally disastrous, reservations that were incorporated into the 1844 state document.
>
> [5 *Proceedings of the Constitutional Convention of 1947,* at 30.]

In short, Governor Driscoll advocated a streamlined Constitution guiding three strong and independent branches of government, each exercising its power with respect for the authority of its coordinate branches. He did not, expressly or by implication, advocate constitutional limits on the Legislature's ability to adjust the pension or health care contributions of New Jersey's justices and judges. Indeed, his testimony suggests substantial deference to the elected branches in matters of policy.

Second, the majority relies upon a statement by Evelyn Seufert. Ms. Seufert was not a member of the Committee on the Judiciary or a delegate to the Constitutional Convention. 1 *Proceedings of the Constitutional Convention of 1947,* at 3. She was one of fifty-

five witnesses who testified before the Committee. 4 *Proceedings of the Constitutional Convention of 1947*, at iii. The draft Judicial Article that Ms. Seufert submitted to the Committee—one of many alternative drafts proposed—used the term "salaries," not "compensation," in its suggestion for the clause at issue here. *Id.* at 29. The document upon which the majority relies is not Ms. Seufert's draft Judicial Article itself, but a summary of the draft, in which Ms. Seufert noted that her proposal includes provisions " 'concerning the selection, terms, retirement, removal, and compensation of the judges.' " *Ante* at 51, 47 *A.*3d at 697 (quoting 4 *Proceedings of the Constitutional Convention of 1947*, at 578). Although it is nothing more than a word used in a witness' summary of her proposed draft—a draft that in any event used the term "salaries"—the majority suggests that Ms. Seufert's reference to "compensation" amounts to a statement of the Framers' intent. *Ibid.*

In fact, like many citizens who participated in the Convention, Ms. Seufert expressed concern that the Legislature retain essential flexibility it its role as the originator of policy, even as that policy would affect the judiciary. Her report notes that her organization's draft is "brief, seeking to safeguard essential features of a responsible Judicial Department without prescribing details better left to legislation, rule and custom." 4 *Proceedings of the Constitutional Convention of 1947*, at 575. The majority's reliance on Ms. Seufert's use of the term "compensation" is, in my view, misplaced.

A review of the actual record confirms that the Framers never endorsed any term but "salaries" in the clause at issue, and never sought to limit legislative adjustments of judicial pension and health benefits. On the contrary, there is affirmative evidence in the proceedings of the Convention that the Framers intended the Legislature to determine judicial pensions in accordance with economic conditions, unconstrained by constitutional limits on its oversight.

That principle is reflected in the debate over what is now Article VI, Section 6, Paragraph 3 of our Constitution. At the Convention, the Committee on the Judiciary proposed in its draft Judicial Article a clause stating: "[p]rovisions for the pensioning of the Justices of the Supreme Court and the Judges of the General Court shall be made by law." 2 *Proceedings of the Constitutional Convention of 1947,* at 1199. Complaining that "the Legislature, with all due respect to it, has done very little for judges," then-Chief Justice Thomas J. Brogan sought to embed justices' and judges' right to a pension in the Constitution. 1 *Proceedings of the Constitutional Convention of 1947,* at 470. He proposed an amendment to the Judiciary Committee's draft article stating "[u]pon the retirement of any such Justice or Judge he shall receive a pension equal in amount to the salary which he is receiving at the time." 2 *Proceedings of the Constitutional Convention of 1947,* at 1207.

Chief Justice Brogan's amendment was met with forceful opposition on the part of the drafters of our Constitution. Nathan L. Jacobs, Vice Chairman of the Judiciary Committee and later an Associate Justice of the Supreme Court, responded with the clarity that would later distinguish his judicial opinions:

> You might recall that that issue came up in the public press some time back. Some of us may well believe in full pensions as a matter of legislative authority. I see no place whatever for it in the Constitution, and it relates again to the principle of flexibility. Could you go back to your people in depression days and justify a constitutional obligation to pay judges $18,000 a year on pension? Think about it! A constitutional requirement is for all time, until further constitutional change. Depressions do not change it; emergencies do not change it; things that you fail to foresee now do not change it. It's there.
>
> [1 *Proceedings of the Constitutional Convention of 1947,* at 475.]

Another member of the Judiciary Committee, Assemblyman Amos Dixon, responded to the Brogan proposal with a comment that underscored the separate status of "salary" and "pension" in the Framers' conception:

> The matter of pensions should certainly be left to the Legislature and not frozen in the Constitution. The fallacy of putting such matters as salary and pension in our Constitution has been very apparent and has been carefully avoided by this Convention, which has removed the salaries of legislators, for instance, therefrom

and have refused to incorporate in their proposal for a new Constitution certain proposals to freeze into this Constitution the matter of pension rights of teachers, police and firemen. These are legislative matters and should be left to the legislators, and I am surprised when I hear that the Legislature doesn't like judges.

[*Id.* at 490.]

Delegate Wayne D. McMurray, cited by the majority for his endorsement of the principle of judicial independence, *ante* at 51–52, 47 *A.*3d at 697–98, was adamantly opposed to any language that would constitutionally constrain the Legislature's authority over judicial pensions:

The amendment freezes pensions at the salary the judge was receiving when retired, and he draws that full pension for life. This is not a good proposal. Who knows that in some time to come, with depression staring the State in the face and thousands of our citizens needing the necessaries of life, it might not be advisable to alter the pension structure? But under the amendment, though others might be starving, retired judges would draw their full pay for as long as they live. I should certainly, for one, dislike to campaign for the adoption of this Constitution and run the risk of being asked to answer that question in public debate.

[1 *Proceedings of the Constitutional Convention of 1947,* at 501–02.]

By a vote of sixty-three to fifteen, the Brogan Amendment failed. *Id.* at 526. Our Constitution affords to the Legislature the latitude demanded by the Framers, and grants to the elected branches the authority to set judicial pensions "by law." *See N.J. Const.* art. VI, § 6, ¶ 3.[5]

The Framers articulated their intent that the Legislature would retain flexibility with respect to judicial pensions in yet another setting. The Judiciary Committee proposed a provision whereby

---

[5] Attempting to distinguish the issue discussed in the cited Convention testimony from the issue now before the Court, the majority characterizes the position advocated by Vice Chairman Jacobs and delegate McMurray as a "refus[al] to include in the Constitution a set dollar amount to either judicial pay or pension." *Ante* at 63, 47 *A.*3d at 704. In fact, Chief Justice Brogan's proposal then under discussion would not have incorporated a "set dollar amount" for judicial "pay or pension" in the Constitution. It would have constitutionally guaranteed to justices and judges a pension equivalent to the justice's or judge's statutory salary upon retirement. 2 *Proceedings of the Constitutional Convention of 1947,* at 1207. Accordingly, the Framers' definitive rejection of the Brogan proposal reflects their intent that the Legislature retain control over judicial pensions, responding to the economic circumstances of a given time.

the Governor may retire a justice or a judge from office who is "so incapacitated as substantially to prevent him from performing his judicial duties." 2 *Proceedings of the Constitutional Convention of 1947*, at 1175. During the Convention's deliberations, an amendment to the original version was proposed that would have added the words "on pension as provided by law," so that the Governor's retirement of an incapacitated justice or judge would entail a constitutionally mandated pension. 1 *Proceedings of the Constitutional Convention of 1947*, at 547. However, delegate Christian J. Jorgensen urged the Framers not to constrain legislative authority in determining judicial pension rights, and proposed alternative language:

> I take it that it is the intention of the committee that [the provision] shall be flexible and the Legislature may from time to time provide the pension. I am wondering whether or not the insertion as it is presently, "on pension as provided by law," may not perhaps freeze the present law with respect to judges' pensions, and I am wondering whether not it would be agreeable to accept an amendment to that so as to read: "on pension as may be provided by law."
> [*Ibid.*]

Vice Chairman Jacobs promptly endorsed that language change, and the alternative language was unanimously adopted. *Ibid.* The final provision authorizes the Governor's retirement of incapacitated justices and judges "on pension as may be provided by law." *N.J. Const.* art. VI, § 6, ¶ 5. In the wake of a depression and a world war, the Framers of our Constitution thus recognized the importance of enabling the Legislature to adjust fiscal policy with respect to judicial pensions.

In my view, the extrinsic evidence of the Framers' intent strongly supports the constitutionality of Chapter 78, as applied to justices and judges. With the burden of demonstrating beyond a reasonable doubt that the Legislature's enactment violates Article VI, Section 6, Paragraph 6, plaintiff can point to no discussion during the Framers' deliberations that establishes, let alone suggests, that the pivotal word "salaries" was intended to include pension and health benefits. *N.J. Const.* art. VI, § 6, ¶ 6. The statements by Governor Driscoll and others clearly reflect the drafters' intent that our judges be independent and our judiciary

strong.  Yet in its thousands of pages, the record of the Convention contains not a single word suggesting that the Framers considered immutable pension and health benefits or constraints on pension and health benefit contributions to be intrinsic, or even related, to judicial independence.  The evidence points decidedly in the other direction.  Debating what would become Article VI, Section 6, Paragraphs 3 and 5, the drafters expressed their intent that the Legislature retain control over pension benefits awarded to justices and judges in changing economic times.

Accordingly, I respectfully disagree with the majority's view that extrinsic evidence of the Framers' intent supports its conclusion that Chapter 78 is unconstitutional.  In my view, the record of the Constitutional Convention confirms the constitutionality of the Legislature's adaptation of judicial benefits to economic circumstances.

## IV.

The majority reviews in detail the history of the Legislature's treatment of judicial pension and health benefits.  *Ante* at 54–58, 47 *A.*3d at 699–701.  It traces the Legislature's enactment of the first judicial pension law, initially codified at *N.J.S.A.* 43:6–6.4 to – 6.10, its creation of the Judicial Retirement System by statute, *N.J.S.A.* 43:6A–1 to –47, and its amendment to the Judicial Retirement System in 1981 to impose, for the first time, a pension contribution requirement upon justices and judges, *N.J.S.A.* 43:6A–34.1(b).  The majority notes that in the same 1981 legislative session in which it imposed that pension requirement, the Legislature raised judicial salaries by statute, and that the net effect of the two enactments was to increase the take-home pay of justices and judges, after deductions.  *Ante* at 56–57, 47 *A.*3d at 700–01.  It reviews two subsequent instances, in 1996 [6] and 2007,

---

[6] In this example, the majority cites to *L.* 1995, *c.* 424 and *L.* 1996, *c.* 8 to show that requiring judicial contribution to health care benefits is linked to an earlier pay raise.  However, those two laws were not enacted in the same legislative

in which the Legislature increased the judiciary's obligation to pay for its benefits. Citing judicial pay raises enacted within a few months before or after the statutory increases in health care contributions, the majority reasons that the Legislature effectively increased rather than diminished the take-home pay of justices and judges. *Id.* at 57–58, 47 *A.*3d at 701. From this juxtaposition of legislative action, the majority finds a "concert of action" that supports its conclusion that the Legislature's most recent enactment regarding judicial pension and health benefits, unaccompanied by a judicial pay raise, is unconstitutional. *Id.* at 58–59, 47 *A.*3d at 701–02.

The majority cites no statement by the Legislature that in prior decades it deliberately undertook benefit reforms and pay raises in tandem to avoid violating Article VI, Section 6, Paragraph 6 of the New Jersey Constitution. Indeed, over the past three decades, the Legislature granted ten judicial pay raises by amendment to the judicial salary statute—in 1980, 1981, 1982, 1991, 1996, 2000, 2001, 2002, 2008, and 2009, *see L.* 1980, *c.* 127; *L.* 1981, *c.* 473; *L.* 1989, *c.* 343; *L.* 1995, *c.* 424; *L.* 1999, *c.* 380, § 6; *L.* 2007, *c.* 350, § 1—not including increases to judicial salaries through appropriations bills, *see, e.g., L.* 2007, *c.* 111. The fact that three of those occasions approximately coincided with changes in pension law does not amount to a legislative endorsement of the majority's conclusion. The leading treatise on statutory construction cautions against judicial attempts to interpret the motives of legislators, absent the Legislature's own expression of the purpose of its legislation:

> References to the motives of members of the legislature in enacting a law are uniformly disregarded for interpretive purposes except as expressed in the statute itself. The reasons which prompted various members to enact the law may be varied, conflicting and difficult to determine, and they may be unrelated to any consideration about the meaning of the statute.
>
> [2A *Sutherland Statutory Construction, supra,* § 48:17, at 619–20.]

---

session. It is especially difficult to divine the intent of the contribution requirement passed by the 207th Legislature, which took office after the 1995 statewide general elections, based on an action taken by the previous 206th Legislature.

I respectfully disagree with the majority's reliance on the Legislature's prior approach to judicial pensions and benefits as a commentary on the constitutionality of its most recent enactment.[7] In prior decades, the Legislature acted to strengthen the financial positions of the judges whose talent and dedication sustain an important branch of government. Last year, the Legislature concluded that economic conditions required a new approach to the pension and benefit contributions of all public employees. That explanation is supported by the legislative history of Chapter 78. *See* Senate President Stephen M. Sweeney, *Sponsor Statement before S. Budget and Appropriations Comm. on Senate Bill No. 2937* (June 16, 2011) ("We have a pension system in crisis, one that is teetering on the brink of collapse. That is becoming

---

[7] The majority's citation to a "competing" bill proposed in, but not enacted by, the Legislature when it considered pension and benefits is, in my opinion, similarly misplaced. *Ante* at 45–47, 57–58, 47 *A.*3d at 694, 701. First, little can be gleaned from the Legislature's failure to enact a law. *See United States v. Price*, 361 *U.S.* 304, 312, 80 *S.Ct.* 326, 331, 4 *L.Ed.*2d 334, 340 (1960) ("Whether Congress thought the proposal unwise ... or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress to act."); *GE Solid State v. Dir., Div. of Taxation*, 132 *N.J.* 298, 313, 625 *A.*2d 468 (1993) ("Legislative inaction has been called a 'weak reed upon which to lean' and a 'poor beacon to follow' in construing a statute." (citations omitted)). Second, even if the existence of the competing bill were to reveal the Legislature's interpretation of the Constitutional provision at issue, the "interpretation placed upon an existing statute by a subsequent group of [legislators] who are promoting legislation and who are unsuccessful has no persuasive significance here." *See United States v. Wise*, 370 *U.S.* 405, 411, 82 *S.Ct.* 1354, 1358–59, 8 *L.Ed.*2d 590, 594–95 (1962); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 *U.S.* 633, 650, 110 *S.Ct.* 2668, 2678, 110 *L.Ed.*2d 579, 597 (1990) ("[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law."); *Amerada Hess Corp. v. Dir., Div. of Taxation*, 107 *N.J.* 307, 322, 526 *A.*2d 1029 (1987) (noting " 'the patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant' " (quoting *Johnson v. Transp. Agency*, 480 *U.S.* 616, 671, 107 *S.Ct.* 1442, 1472, 94 *L.Ed.*2d 615, 656 (1987) (Scalia, J., dissenting))), *aff'd*, 490 *U.S.* 66, 109 *S.Ct.* 1617, 104 *L.Ed.*2d 58 (1989).

clearer as we see record numbers of public employees retiring. What happens to those folks if we don't act now to save their pension? We have a commitment and responsibility to public employees to ensure the health and welfare of their pension."). Clearly expressing its intent when it enacted Chapter 78, the Legislature has spoken for itself.

The Legislature's decision to include justices and judges in Chapter 78 indisputably represents an adaptation of legislative pension and benefits policy in response to changing economic conditions. That change does not, in my view, give rise to a legitimate inference that only the Legislature's prior policy conformed to the requirements of the Constitution. Accordingly, I disagree with the majority in this regard.

## V.

The majority opinion relies heavily upon federal law in its conclusion that the statute is unconstitutional. *Ante* at 58–62, 47 *A.*3d at 701–04. It traces the history of the federal Compensation Clause [8] found in Article III, Section 1 of the federal Constitution, from its origins in Alexander Hamilton's tribute to judicial independence in *The Federalist No. 79,* through its treatment in the Virginia state constitution ratification debates of 1829–1831, and its construction in United States Supreme Court cases over the past century. *Id.* at 48–51, 47 *A.*3d at 695–97. It concludes that the State's position regarding the constitutionality of the statute is not buttressed by federal law. *Id.* at 61–62, 47 *A.*3d at 703–04.

In my opinion, current federal law provides no support to the party that should bear the burden in this case—the plaintiff seeking to invalidate Chapter 78. Plaintiff has asserted no federal

---

[8] The majority calls Article III, Section 1 of the federal Constitution "the No–Diminution Clause." Federal case law describes it as the "Compensation Clause," *see, e.g., United States v. Hatter,* 532 *U.S.* 557, 121 *S.Ct.* 1782, 149 *L.Ed.*2d 820 (2001), and accordingly it is so termed herein.

constitutional claim, and it is State constitutional law that governs. Moreover, the federal Compensation Clause, providing that federal judges shall "receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office," does not share with its New Jersey counterpart the critical word "salaries." *U.S. Const.* art. III, § 1. No federal court has construed Article VI, Section 6, Paragraph 6 of the New Jersey Constitution, or considered the constitutionality of Chapter 78. Notwithstanding the majority's extensive exploration of federal law, no case decided by the United States Supreme Court or the lower federal courts addresses the issue before us.

Moreover, federal law as it has recently developed provides substantially more support for the State's position than for the plaintiff's—a crucial point given the burden of proof that should have been imposed on plaintiff here. *See Lewis, supra,* 188 *N.J.* at 459, 908 *A.*2d 196; *Gangemi, supra,* 25 *N.J.* at 10, 134 *A.*2d 1. Even if plaintiff had asserted a federal claim, or the United States Supreme Court's interpretation of the federal Compensation Clause were binding here, federal law as it has recently developed would not justify a decision declaring unconstitutional the New Jersey Legislature's enactment.

The leading case interpreting the Compensation Clause is *United States v. Hatter,* 532 *U.S.* 557, 121 *S.Ct.* 1782, 149 *L.Ed.*2d 820 (2001), in which the United States Supreme Court overruled its prior holding in *Evans v. Gore,* 253 *U.S.* 245, 40 *S.Ct.* 550, 64 *L.Ed.* 887 (1920). In *Evans,* the Supreme Court had invalidated a Congressional action that imposed taxation on the compensation of federal judges as an indirect diminution on judicial pay:

> Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive, as [Alexander Hamilton in *The Federalist No. 79* ] suggested. But all which, by their necessary operation and effect, withhold or take from the judge a part of that which has been promised by law for his services, must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle.
>
> [*Evans, supra,* 253 *U.S.* at 254, 40 *S.Ct.* at 553, 64 *L.Ed.* at 892.]

The *Evans* majority opinion was criticized in dissent by Justice Holmes, joined by Justice Brandeis. They rejected the notion that the levying of income taxes upon federal judges could be construed as an attack upon judicial independence:

> The exemption of salaries from diminution is intended to secure the independence of the judges, on the ground, as it was put by Hamilton in the Federalist (No. 79), that "a power over a man's subsistence amounts to a power over his will." That is a very good reason for preventing attempts to deal with a judge's salary as such, but seems to me no reason for exonerating him from the ordinary duties of a citizen, which he shares with all others. To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge. I see nothing in the purpose of this clause of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being, if not their life, depends.
>
> [*Id.* at 265, 40 *S.Ct.* at 557, 64 *L.Ed.* at 897 (Holmes, J., dissenting).]

*Evans'* exemption of judges from the obligation to pay federal taxes "met wide and steadily growing disfavor from legal scholarship and professional opinion." *O'Malley v. Woodrough,* 307 *U.S.* 277, 281, 59 *S.Ct.* 838, 839, 83 *L.Ed.* 1289, 1293 (1939).

In *United States v. Will,* 449 *U.S.* 200, 101 *S.Ct.* 471, 66 *L.Ed.*2d 392 (1980), the Supreme Court considered a provision of the Postal Revenue and Federal Salary Act of 1967, 2 *U.S.C.* §§ 351–361. To the extent that the Salary Act retroactively repealed cost-of-living salary increases for federal judges, thus reducing the judges' salaries after the salary increases had vested, the Supreme Court held it to be unconstitutional. *Id.* at 226–30, 101 *S.Ct.* at 486–88, 66 *L.Ed.*2d at 412–15. The Court reaffirmed its holding in *O'Malley* that "the compensation clause was not offended by an income tax levied on Article III judges as well as on all taxpayers." *Will, supra,* 449 *U.S.* at 226, 101 *S.Ct.* at 486, 66 *L.Ed.*2d at 412. Unlike Chapter 78, the federal Salary Act effected a direct reduction of the annual salaries of some of the federal judges at issue, and accordingly *Will* does not address the issue before this Court. *Will* is, however, significant for its role in the Supreme Court's departure from its holding in *Evans v. Gore.*

That departure was completed by the Supreme Court in *Hatter, supra,* 532 *U.S.* at 567, 121 *S.Ct.* at 1792, 149 *L.Ed.*2d at 833–34.

There, the United States Supreme Court underscored the principle of judicial independence, restating its historical import and practical effect on the administration of justice. *Id.* at 567–69, 121 *S.Ct.* at 1791–92, 149 *L.Ed.*2d at 832–33. However, the Supreme Court rejected the premise of *Evans* that the federal Compensation Clause entitled federal judges to an exemption from nondiscriminatory laws that effect an "indirect" reduction of salary:

[A] tax law, unlike a law mandating a salary reduction, affects compensation indirectly, not directly. See [*Will, supra,* 449 *U.S.* at 226, 101 *S.Ct.* at 486, 66 *L.Ed.*2d at 412] (distinguishing between measures that directly and those that indirectly diminish judicial compensation). And those prophylactic considerations that may justify an absolute rule forbidding direct salary reductions are absent here, where indirect taxation is at issue. In practice, the likelihood that a nondiscriminatory tax represents a disguised legislative effort to influence the judicial will is virtually nonexistent.

[*Hatter, supra,* 532 *U.S.* at 571, 121 *S.Ct.* at 1792, 149 *L.Ed.*2d at 834.]

Thus, the United States Supreme Court explained that an indirect reduction in salary, applied to judges in a nondiscriminatory manner, simply does not imperil judicial independence. *Ibid.* It struck down portions of the Social Security tax law that it found discriminatory in its impact upon sitting judges, and upheld the nondiscriminatory Medicare law under review. *Id.* at 572, 578, 121 *S.Ct.* at 1793, 1796, 149 *L.Ed.*2d at 834, 838.[9]

Of course, *Hatter* is not directly on point. It neither applies New Jersey's constitutional language nor reviews a pension and health benefit statute analogous to Chapter 78.[10] However, its

---

[9] The majority quotes a sentence from *Hatter,* asserting that *Hatter* rejected the argument that " 'Article III protects judges only against a reduction in stated salary, not against indirect measures that only reduce take-home pay.' " *Ante* at 61, 47 *A.*3d at 703 (quoting *Hatter, supra,* 532 *U.S.* at 576, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 837). In the sentences following the language quoted by the majority here, the United States Supreme Court identified the "indirect" measure that would run afoul of the Compensation Clause: a discriminatory tax. *Hatter, supra,* 532 *U.S.* at 576–77, 121 *S.Ct.* at 1795, 149 *L.Ed.*2d at 837. Not even plaintiff suggests that Chapter 78 is discriminatory. Accordingly, the majority's citation to *Hatter* on this point is irrelevant to this case.

[10] None of the three decisions from other states cited by the majority addresses a statute analogous to Chapter 78. *See Hudson v. Johnstone,* 660 *P.*2d 1180,

general principle—that nondiscriminatory indirect reductions imposed against a vast group of individuals do not inhibit judicial independence—underscores the constitutionality of Chapter 78. Accordingly, I cannot agree with the majority that *Hatter* constitutes authority for the proposition that Chapter 78, as applied to justices and judges, violates our Constitution.[11]

Moreover, the majority's discussion of the United States Supreme Court and sister-state jurisprudence strongly suggests that it imposes upon the State the burden of proving the constitutionality of Chapter 78. The majority chides the State for a "misinterpretation" of *Hatter* and for failing to support its position that Chapter 78 is constitutional with case law from the federal court or the highest courts of other states. *Ante* at 61–62, 47 *A*.3d at 703–04. The State should have no burden to demonstrate the constitutionality of Chapter 78; it is plaintiff's burden to show that Chapter 78's "repugnancy to the constitution is clear beyond reasonable doubt." *Gangemi, supra,* 25 *N.J.* at 10, 134 *A*.2d 1; *see also Hamilton Amusement Ctr., supra,* 156 *N.J.* at 285, 716

---

1185 (Alaska 1983) (challenge to state pension law mandating judicial pension contributions under Alaska constitutional provision addressing "compensation"); *Jorgensen v. Blagojevich,* 211 *Ill*.2d 286, 285 *Ill.Dec.* 165, 811 *N.E*.2d 652, 654 (2004) (invalidating statute that revoked previously-vested cost-of-living-increase to judicial salaries under Illinois constitutional clause barring diminution of judge's salary during judicial term); *Stilp v. Pennsylvania,* 588 *Pa.* 539, 905 *A*.2d 918, 981 (2006) (invalidating statute revoking previous pay raise for judges as diminution in judicial salary barred by Pennsylvania Constitution).

11 The majority contends that the Attorney General at oral argument "concedes that the protection under our constitutional No–Diminution Clause was intended to provide no less protection than that provided to federal judges." *Ante* at 52, 47 *A*.3d at 698. In fact, consistent with the text of Article VI, Section 6, Paragraph 6, the Attorney General responded that New Jersey judges and justices are entitled to the same protections against a diminution of their salaries as are federal judges. That statement, however, included the Attorney General's further response that both state and federal Constitutions protect judicial independence. He did not discuss pension and benefit considerations in this context. That statement supports the argument that to the extent that federal law is pertinent to this case, it supports the constitutionality of Chapter 78.

*A*.2d 1137; *Bd. of Ed. of Piscataway Twp. v. Caffiero*, 86 *N.J.* 308, 318, 431 *A*.2d 799, *appeal dismissed*, 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981). That burden, I respectfully submit, has neither been imposed nor satisfied in this case.

## VI.

I share the majority's respect for judicial independence. It is the responsibility of every justice and judge to fairly and impartially analyze each case. The oath that each justice and judge takes demands that he or she carefully study the law that our Framers, our Legislature and our courts have given us, and apply that law to the best of his or her ability. Every day, in courtrooms all over our state, our judges do precisely that. Our judiciary serves the people of New Jersey with skill, diligence and integrity.

I do not share the notion that Chapter 78 is or could be construed as a legislative attack on judicial independence. The law struck down today as applied to justices and judges affects not only their pension and health benefit contributions, but the pension and health benefit contributions of hundreds of thousands of public employees, including the professional staff without whom the judiciary could not fulfill its mission. Viewed in the context of its broad reach, Chapter 78 could never be mistaken for a legislative effort to influence or intimidate one judge in particular or the judiciary as a whole.

As Nathan Jacobs noted, the "principle of flexibility" shaped our Constitution; the Framers intended to avoid constraining the fiscal policy of future Legislatures confronting "[d]epressions," "emergencies" and "things that you fail to foresee." 1 *Proceedings of the Constitutional Convention of 1947*, at 475. In an era of a struggling economy and the dramatic reform of retirement and health care financing, the "principle of flexibility" has never been more critical to our government's ability to serve the people of our State. Our Framers intended to enable the Legislature to calibrate pension and health care policy to changing times. The

Legislature should not be constrained from adjusting that policy over the life of a judicial term that can last a generation. I respectfully submit that the Framers' intent is not served by the Court's decision today.

In my view, in applying Chapter 78 to justices and judges, the Legislature acted within the scope of its constitutional authority. I cannot conclude that plaintiff has met his burden to prove, beyond a reasonable doubt, that Chapter 78 violates Article VI, Section 6, Paragraph 6 of the New Jersey Constitution.

I would reverse the determination of the trial court, and I respectfully dissent.

*For affirmance*—Justices LaVECCHIA and ALBIN, and Judge WEFING (temporarily assigned)—3.

*For reversal*—Justices HOENS and PATTERSON—2.

*Not Participating*—Chief Justice RABNER.